**Un-SEALED**
8/30/19

United States Courts
Southern District of Texas
FILED

August 30, 2019

David J. Bradley, Clerk of Court

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### CORPUS CHRISTI DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA, and the STATE OF TEXAS, | Civil Action No. _2:18-cv-465_ |
| *ex rel.* MICHAEL MINTZ | COMPLAINT |
| and | |
| DAVID WILLIAMSON | FILED UNDER SEAL |
| Plaintiffs, | |
| vs. | JURY TRIAL DEMANDED |
| CHRISTUS HEALTH, | |
| CHRISTUS SPOHN HEALTH SYSTEM CORPORATION, | |
| CHRISTUS SPOHN HOSPITAL – MEMORIAL, | |
| CHRISTUS SPOHN HOSPITAL – SHORELINE. | |
| Defendants. | |

1.      On behalf of The United States of America and the State of Texas (collectively, the "Government"), plaintiffs and relators Michael Mintz and David Williamson ("Relators") file this qui tam Complaint under the federal False Claims Act, 31 U.S.C. §3729 et seq ("FCA") and the Texas Medicaid Fraud Prevention Act ("MFPA") against defendants CHRISTUS Health, CHRISTUS Spohn Health System Corporation (CHRISTUS Spohn"), CHRISTUS Spohn Hospital – Memorial ("Memorial") and CHRISTUS Spohn Hospital – Shoreline ("CHRISTUS Shoreline") (collectively, "Defendants"), and allege as follows:

## I.      INTRODUCTION

2.      This is an action to recover treble damages and civil penalties on behalf of the Government arising from Defendants' fraudulent scheme to overcharge the Government for inpatient and outpatient spinal surgeries performed at Defendants' CHRISTUS Memorial and Shoreline facilities.  Through means of this scheme, Defendants knowingly submitted or caused the submission of false claims to federal and state health insurance programs for physician services that did not meet applicable payment conditions for such services, in violation of the FCA. Defendants' FCA violations in turn defrauded Government healthcare programs by amounts reaching the hundreds of millions.

3.      As alleged herein, since at least 2011, Defendants have engaged in an illegal scheme calculated to maximize revenue from medical services performed by CHRISTUS Shoreline spine surgeon, Dr. Matthew Alexander.  Defendants have submitted or caused the submission of false claims for (1) nonreimbursable surgical procedures that violate Medicare billing criteria governing "overlapping surgeries" performed by teaching surgeons, and (2) excessively long anesthesia services performed while the attending surgeon is located elsewhere in the hospital.

4.      First, from at least 2011, Defendants have engaged in an illegal scheme to bill Medicare for concurrent surgeries in which:

- Dr. Alexander falsely represents that he is not a teaching surgeon, even though his patients were treated, examined, and/or admitted by Family Practice and Emergency Room residents;

- Dr. Alexander was not present during the majority of the surgery, including the "key and critical" portions; and

- Dr. Alexander's patient was left without a physician surgeon in attendance, while Dr. Alexander was involved in another surgery and no other qualified surgeon was made immediately available to assist, if needed or in time of emergency.

5.      Second, during the pre-op phase for the majority of surgeries performed by Dr. Alexander, patients were placed under anesthesia for an unnecessarily prolonged period of time. Routinely, Dr. Alexander's patients are subjected to such medically unnecessary anesthesia when non-physician personnel performing surgery in Dr. Alexander's stead reach an impasse and are required to await Dr. Alexander's arrival. This practice places patients at great risk because anesthesia should be used for the shortest possible durations. Further, the practice translated into substantially increased costs for the Government, which reimburses anesthesiologists based on time spent with patients under anesthesia.

## II.      JURISDICTION AND VENUE

6.      Relators bring this action on behalf of themselves, the United States and the State of Texas for violations of the False Claims Act, 31 U.S.C. §§ 3729-3733.

7.      This Court has federal subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. § 3730. This Court has supplemental jurisdiction

over the counts relating to the Texas Medicaid Fraud Prevention Act ("MFPA") pursuant to 28 U.S.C. § 1367 and 31 U.S.C. § 3732(b).

8.      This Court has personal jurisdiction over Defendants, pursuant to 31 U.S.C. § 3732(a), because Defendants can be found in and transact business in this District. In addition, the acts prohibited by 31 U.S.C. § 3729 occurred in this District. 31 U.S.C. § 3732(a).

9.      Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Defendants transact business in this District and numerous acts proscribed by 31 U.S.C. § 3729 occurred in this District.

10.      This suit is not based upon prior public disclosures of allegations or transactions in a federal criminal, civil, or administrative hearing in which the Government is already a party, or in a congressional, Government Accountability Office, or other federal report, hearing, audit, or investigation, or from the news media, as enumerated in 31 U.S.C. § 3730(c)(4)(A).

11.      To the extent that there has been a public disclosure unknown to the Relator, the Relator is the "original source" under 31 U.S.C. § 3730(e)(4)(B). The Relator has independent material knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing this qui tam action based on that information. Id.

**III.      PARTIES**

12.      Relator Dr. Michael Mintz is an ENT-otolaryngologist in Corpus Christi, Texas and is affiliated with multiple hospitals in the area, including Christus Spohn Hospital Corpus Christi-Shoreline and Corpus Christi Medical Center. He received his medical degree from Wayne State University School of Medicine and has been in practice for more than 40 years. Dr. Mintz accepts several types of health insurance, listed below. He is one of 10 doctors at Christus Spohn Hospital

4

Corpus Christi-Shoreline and one of 6 at Corpus Christi Medical Center who specialize in Otolaryngology (ENT).

13.     Relator Dr. David Williamson is an anesthesiologist in Corpus Christi, Texas and is affiliated with multiple hospitals in the area, including Christus Spohn Hospital Corpus Christi-Shoreline. He received his medical degree from Louisiana State University School of Medicine in Shreveport and has been in practice for more than 20 years. Dr. Williamson is a principal of Gulf Shore Anesthesia Associates, through which he and his colleagues performed anesthesia surgery at Defendants' hospitals, including CHRISTUS Shoreline and CHRISTUS Memorial.

14.     CHRISTUS Health is a Texas nonprofit corporation and one of the largest Catholic health systems in the United States.  CHRISTUS Health provides healthcare services through numerous hospitals and other facilities in six states and in Mexico, including Defendant CHRISTUS Spohn Health System Corporation.[1]

15.     CHRISTUS Spohn Health System Corporation is a Texas nonprofit corporation and wholly-owned subsidiary of CHRISTUS Health.  CHRISTUS Spohn operates six hospitals along the Texas Gulf Coast, including the two primary hospitals in which Defendants' wrongdoing occurred: CHRISTUS Spohn Hospital– Shoreline and CHRISTUS Spohn Hospital– Memorial.[2]

---

[1] Other component institutions within the CHRISTUS Health system include CHRISTUS Health Central Louisiana, CHRISTUS Health Northern Louisiana, CHRISTUS Health Southwestern Louisiana, Baptist St. Anthony's Health System, CHRISTUS Health Ark-La-Tex, CHRISTUS Health Gulf Coast, CHRISTUS Health Southeast Texas, CHRISTUS Santa Rosa Health Care and CHRISTUS Health Utah.

[2] The remaining six hospital subsidiaries of CHRISTUS Spohn Health System Corporation are CHRISTUS Spohn Hospital Corpus Christi – Memorial; CHRISTUS Spohn Hospital Corpus Christi – Shoreline; CHRISTUS Spohn Hospital Corpus Christi – South;  CHRISTUS Spohn Hospital Corpus Christi – Alice; CHRISTUS Spohn Hospital Corpus Christi – Beeville; and CHRISTUS Spohn Hospital Kleberg.

16.     CHRISTUS Spohn Hospital – Memorial is a Texas nonprofit corporation and wholly owned subsidiary of CHRISTUS Health. The hospital is part of the CHRISTUS Spohn network and is located in Corpus Christi, Texas.

17.     CHRISTUS Spohn Hospital – Shoreline is a Texas nonprofit corporation and wholly owned subsidiary of CHRISTUS Health. The hospital is part of the CHRISTUS Spohn network and is located in Corpus Christi, Texas.

## IV.     STATUTORY AND REGULATORY BACKGROUND

### A.     MEDICARE

#### 1.     In General

18.     In 1965, Congress enacted Title XVIII of the Social Security Act, 42 U.S.C. § 1395 et seq., known as the Medicare program.  Medicare is a federal health insurance program that pays for covered medical care provided to eligible individuals. Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease.  42 U.S.C. §§ 426, 426-1.  Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"), which is part of the Department of Health and Human Services.

19.     Medicare operates by authorizing payments in accordance with government established conditions and rates for covered inpatient and outpatient healthcare services to "providers," such as hospitals, skilled nursing facilities, outpatient rehabilitation facilities, and home health agencies. 42 U.S.C. §§ 1395cc(a), 1395x(u). Two major parts of Medicare—Parts A & B—pay for medical items and services on a "fee-for-service" basis.

20.     Medicare Part A is hospital insurance that helps cover certain types of care provided by institutional providers within specified limits.  See 42 U.S.C. § 1395c et seq.  Specifically, Medicare Part A authorizes payments for covered hospital inpatient services.

21.     Medicare Part B establishes a voluntary supplemental insurance program that pays for various medical and other health services and supplies, including physician services, physical, occupational, and speech therapy services, and hospital outpatient services. See id. §§ 1395k, 1395m, 1395x.

22.     In order to participate in the Medicare program, a healthcare provider such as a hospital must enter into an agreement ("Provider Agreement") with the Secretary of HHS.  42 U.S.C. § 1395cc.  After entering into a Provider Agreement, Medicare pays a pre-determined rate directly to the hospital for covered inpatient and outpatient services provided to Medicare beneficiaries, minus any deductible or coinsurance, which are collected from the beneficiaries. Id.

23.     In order to qualify for payments by Medicare for services provided, providers must submit an enrollment application to the program on its Form CMS 855A.  Among other things, the application requires providers to sign a certification that states in relevant part:

24.     I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider.  The Medicare laws, regulations, and program instructions are available through the Medicare contractor.  I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal antikickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

25.     Additionally, when submitting claims for reimbursement to Medicare, the provider is required to certify on CMS Form 1500 , inter alia, that: 1) the information on this form is true, accurate and complete; 2) sufficient information is provided to allow the government to make an informed eligibility and payment decision; 3) the claim complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment; and 4) the services on

7

this form were medically necessary. The form further requires the provider to certify that the services on the form were "personally furnished by me or were furnished incident to my professional service by my employee under my direct supervision, except as otherwise expressly permitted by Medicare." Id.

### 2.    Medicare Reimbursement Rules Governing Teaching Hospitals

26.    Teaching hospitals such as CHRISTUS Memorial and CHRISTUS Shoreline that provide Graduate Medical Education ("GME") to medical students, residents, and fellows ("trainees") receive substantial payments from the United States government for resident physician[3] training and salaries though direct and indirect graduate medical education payments under Medicare Part A. Hospitals are generally reimbursed under Medicare Part A on a reasonable cost basis for services provided to Medicare beneficiaries.  Resident salaries, as well as patient care services by interns, residents and fellows that fall within the scope of their training program are included among the costs for which hospitals are reimbursed under Medicare Part A.[4]

27.    Medicare Part B pays for services that physicians provide to covered patients at Teaching Hospitals in the outpatient setting. Physician services, which include medical and surgical procedures, office visits, and medical consultations, may be provided in facility settings, such as hospital outpatient departments and freestanding ambulatory surgical centers (ASC), or in non-facility locations, such as physician offices, urgent care centers, and independent clinics. Physicians are required to identify the place of service on the health insurance claim forms that

---

[3] A resident is a medical school graduate engaged in in-depth training in a medical specialty, which may last from 3-5 years depending upon the specialty. Residents are to be supervised by teaching physicians who approve their decision-making.

[4] A resident is a medical school graduate engaged in in-depth training in a medical specialty, which may last from 3-5 years depending upon the specialty. Residents are to be supervised by teaching physicians who approve their decision-making.

they submit to Medicare contractors. The correct place-of-service code ensures that Medicare does not incorrectly reimburse the physician for the overhead portion of the service if the service was performed in a facility setting.

28.     Teaching hospitals employ "teaching physicians," broadly defined as physicians, other than residents, who involve residents in the care of their patients at any stage.  See CMS Teaching Physician Guidelines. It is a bright line test: once a physician involves a resident in the care of the physician's patients, that physician is considered a teaching physician. If a primary surgeon involves residents at any stage of the care of his patients, even at evaluation and admission stage or post-op follow-up, that primary surgeon is considered a teaching physician pursuant to the Medicare regulations, required to abide by the regulations that govern the behavior of these particular physicians.  Among the regulations the teaching physician surgeon and hospital must follow, are certain restrictions on billing for concurrent and overlapping surgeries. As summarized in the chart appended to the Senate Finance Committee Report, "Concurrent and Overlapping Surgeries: Additional Measures Warranted" (Dec. 6, 2016),[5] CMS defines concurrent surgeries as those where the critical or key parts of two surgeries are performed by the same teaching physician at the same time. The teaching physician is not allowed to bill for such surgeries. Overlapping surgeries are permitted as follows: "[The] teaching physician must be present during the critical or key portions of both procedures. The teaching physician may become involved in a second procedure when the key portions of the initial procedure have been completed. If the teaching physician is not present during non-critical and non-key portions and is participating in another

---

[5] *See* page 19 of the Appendix (hereafter "2016 Senate Finance Committee Report.") Available at www.finance.senate.gov/imo/media/doc/Concurrent%20Surgeries%20Report%20Final.pdf and attached hereto as Exhibit H.

surgical procedure, she/he must arrange for another qualified surgeon to immediately assist in the other case should the need arise." Id. at 19. If the above conditions are not met, CMS will not pay. (perhaps better to say- the claim is false or improper?)

29.     "Physically present" means that the teaching physician is located in the same room as the patient (or a room that is subdivided with partition or curtained areas to accommodate multiple patients) and/or performs a face-to-face service.   See CMS Teaching Physician Guidelines; DHHS Medicare Carriers Manual (Trans 1780) and CMS Pub-100-04 (Trans. 811).

30.     Critical or key portions" means the part of parts of services that a teaching physician determines are critical or a key portion.   See CMS Teaching Physician Guidelines; DHHS Medicare Carriers Manual, Trans. 1780 and CMS Pub-100-04, Trans. 811.

31.     The CMS Medicare Claims Processing Manual provides that, if a teaching physician engages in two surgeries that overlap, the "[t]he critical or key portions may not take place at the same time. When all the key portions of the initial procedure have been completed, the teaching surgeon may begin to become involved in a second procedure." CMS 2011 Claims Manual at 100.1.2 (Surgical Procedures) A (emphasis added). This requirement makes it particularly difficult to schedule two concurrent high-risk surgeries, because it can be nearly impossible to ensure that the large quantity of critical portions that do not overlap.

32.     Further "[d]uring non-critical or non-key portions of the surgery, if the teaching surgeon is not physically present, he/she must be immediately available to return to the procedure, i.e., he/she cannot be performing another procedure." Medicare Claims Processing Manual, 100.1.2-A Surgical Procedures at 153-155 (Jan. 4, 2010) (emphasis added).

33.     When a teaching physician is participating in a second surgical procedure and "not present during non-critical or non-key portions of the [prior] procedure … he/she must arrange for

10

another qualified surgeon to immediately assist the resident in the other case should the need arise." CMS 2011 Claims Manual at 100.1.2 (Surgical Procedures) A.[6] The resident should not be conducting the concurrent surgery alone, without the immediate availability of a qualified surgeon.

34.     Nor may a physicians' assistant conduct a concurrent surgery alone, without the immediate availability of a qualified surgeon. Therefore, effectively, the teaching physician can either: (i) be present for all critical portions of a surgery, assisted by a resident or physician assistant; or (ii) delegate to a resident or physicians' assistant while making a qualified surgeon immediately available; or (iii) can delegate to a physician's assistant without making any qualified surgeon immediately available, and receive no payment for the physician's assistant or himself.

35.     Teaching physicians may submit a maximum of two concurrent surgical procedures under their names. However, they may not seek reimbursement for surgical procedures under their names in the case of three concurrent surgical procedures. Here "the role of the teaching surgeon … in each of the cases is classified as a supervisory service to the hospital rather than a physician service to an individual patient and is not payable under the physician fee schedule." CMS 2011 Claims Manual" at 100.1.2 (Surgical Procedures) at A. 2.

36.     Medicare providers are required to make restitution to the Medicare Programs when overpayments are identified unless the provider is without fault. See 42 U.S.C. § 1320a-7b(a)(3); see also 42 C.F.R. 405.350 et seq.; 42 C.F.R. § 489.20(b); OIG Compliance Guidance for Hospitals, 63 Fed. Reg. 8987, 8998 (Feb. 23, 1998).

---

[6] CMS regulations require participating hospitals to "assure that personnel are licensed or met other applicable standards that are required by State or local laws." 42 C.F.R. §482.11(c) (Condition of participation; Compliance with Federal, State and local laws).

37.     Not every physician who works at a teaching hospital is a teaching physician. For example, surgeons at teaching hospitals are exempt from the applicable restrictions governing teaching physicians if the primary surgeon has an across-the board policy of never involving residents in the preoperative, operative or postoperative care of his or her patients. CMS Medicare Claims Processing Manual 100.1.7(D) (emphasis added).[7] Generally this circumstance applies to physicians whose practices are separate and distinct entities from the graduate medical education programs at the hospitals where they work. Physicians in these practices do not rely on the teaching hospital for any human resources throughout the chain of patient care, including initial evaluations and admissions or post-operative follow-up. As such, these non-teaching physicians are able to make more liberal use of non-resident assistants such as physician assistants, and may submit claims to Medicare for the use of these assistants in the ordinary course. This case does not concern a non-teaching physician.

B.      **MEDICAID**

38.     Medicaid is a federal and state funded health program, benefiting "categorically eligible" people, who are mostly low-income individuals and families.  Like Medicare, it was created in 1965 pursuant to Title XIX of the Social Security Act.  Under Medicaid, participating states administer state Medicaid programs that subsidize healthcare coverage for eligible residents. The individual state programs reimburse medical providers and hospitals for services rendered to program participants.  The states receive federal funds to pay for Medicaid services.

39.     Each state's Medicaid program must cover hospital services, 42 U.S.C. § 1396(a)(10)(A), 42 U.S.C. § 1396d(a)(12), and uses a cost reporting method similar to that used under Medicare.

---

[7] https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/clm104c12.pdf

40.     The Medicaid program pays for services pursuant to plans developed by the states and approved by the U.S. Department of Health and Human Services ("HHS") through CMS. See 42 U.S.C. §1396a(a)-(b).   States pay doctors, hospitals, pharmacies, and other providers and suppliers of medical goods and services according to government-established rates. See 42 U.S.C. §1396b(a)(1), 1903(a)(1).   The federal government then pays each state a statutorily determined percentage of "the total amount expended . . . as medical assistance under the State plan . . . " See 42 U.S.C. §1396b(a)(1).   This federal-to-state payment is known as federal financial participation.

41.     Each physician who participates in the Medicaid program must sign a Medicaid provider agreement with his or her state.   Although there are variations in the agreements among the states, all states require the prospective Medicaid provider to agree that he or she will comply with all Medicaid requirements, including the fraud and abuse provisions.

42.     Similar to Medicare coverage requirements, medical services must be reasonable and medically necessary in order to be subsidized by Medicaid.   Claims for reimbursement presented by a provider to a state Medicaid program are subject to terms of certification.   These terms require that the medical services for which the claims are sought were provided in accordance with applicable federal and state laws.

## C.     OTHER GOVERNMENT-FUNDED HEALTH PROGRAMS

43.     In addition to Medicare and Medicaid, the federal government reimburses a portion of the cost of medical services under several other federal health care programs with similar coverage requirements, including, without limitation, programs administered by the Department of Defense (the "DOD"), the Department of Veteran's Affairs (the "VA") and the Office of Personnel Management (the "OPM").

13

44.     The DOD administers TRICARE (formerly CHAMPUS), a health care program covering individuals and dependents affiliated with the armed forces. The VA administers its own health program, along with CHAMPVA (a shared cost program), covering families of veterans. OPM administers the Federal Employee Health Benefit Program, a health insurance program covering federal employees, retirees, and survivors.

## V.     DEFENDANTS CAUSED FALSE CLAIMS TO BE SUBMITTED TO GOVERNMENT HEALTHCARE PAYERS

### A.     Concurrent Surgeries Performed While Absent for Critical Portions and Without Additional Coverage by Qualified Teaching Physicians

45.     Defendants' violations of Medicare's payment conditions regarding overlapping surgeries as set forth above disqualified Dr. Alexander's surgeries from Medicare reimbursement. More specifically, during the relevant period and continuing to the present, Defendants knowingly submitted claims to Medicare that falsely reflected the presence, supervision and direction of a qualified surgeon for surgeries performed by Dr. Alexander.

46.     Nearly all concurrent surgeries performed by Dr. Alexander at CHRISTUS Memorial and Shoreline that were billed to Medicare have been and continue to be tainted by at least one or more of violations of Medicare's overlapping surgery regulations. Defendants' knowing failure to police these violations has caused the submission of false claims to Medicare for Dr. Alexander's surgeries.  Because Medicare pays for a significant proportion of spinal and other surgeries performed at CHRISTUS Memorial and Shoreline annually, Defendants knowing misconduct resulted in windfall profits to the hospital.

47.     Over the course of Relators' work at CHRISTUS Shoreline, Defendants routinely submitted false claims for Dr. Alexander's services at the full physician fee schedule despite their

knowledge that they were not entitled to payment for those services under applicable Medicare rules governing overlapping surgery.

48.     On or about 2011, Relators became aware of Defendants' practice of listing Dr. Alexander as the lead on multiple surgeries occurring at the same time. Relators understood that such a practice would require that residents and/or physician assistants on the surgical teams at CHRISTUS Memorial and Shoreline conduct some or all of the surgery outside of the presence of the teaching surgeon.

49.     Dr. Alexander falsely represents to the public that he is not a teaching physician because he has an "across the board policy" of not using residents.  But Dr. Alexander is a "teaching surgeon" because he utilizes residents for pre- and post-op services. *See* 42 C.F.R. § 415.152 ("Teaching physician means a physician (other than another resident) who involves residents in the care of his or her patients."); *see also* CMS Medicare Claims Processing Manual 100.1.7(D).  The fact that Dr. Alexander may not use residents in the operating room is irrelevant under CMS Medicare Claims Processing Manual 100.1.7(D).  Use of residents for pre-operative and post-operative care determines if a physician qualifies as, and is obliged as, a teaching physician.

50.     In Dr. Alexander's practice, the hospital's Emergency Medicine residents and Family Practice residents admit patients with neurological problems, and may follow-up with these patients particularly if the patients return to the ICU. The residents' footprints are visible throughout Dr. Alexander's patient files. Defendants' Emergency Room Visit Notes illustrate that the residents regularly consult with Dr. Alexander throughout the course of the patients' care and provide medical services before and after surgical operations. It is clear from these notes that residents do not merely play a peripheral role in Dr. Alexander's practice. Instead they play a key

15

role in managing the ongoing care and status of Dr. Alexander's patients, precisely as the Medicare rules governing teaching physicians contemplate.

51.     Examples of Dr. Alexander's routine use of residents include:

a.  On May 6, 2018, Resident A performed pre-operative treatment on a patient who had received a skull injury caused by a taser gun, after which Dr. Alexander performed surgery on the patient.

b.  On June 14, 2018, Dr. Alexander performed surgery on a patient who was suffering from subdural hematoma, after which Resident A performed post-operative treatment on the patient.

c.  On March 2, 2018, Resident B performed pre-operative treatment on a patient suffering from cranial bleeding, after which Dr. Alexander performed surgery on the patient.

d.  On March 14, 2018, Resident C performed pre-operative treatment on a patient suffering from a subdural hematoma, after which Dr. Alexander performed surgery on the patient.

52.     Because residents play a role in Dr. Alexander's practice, he qualifies as a teaching physician and the regulations governing teaching physicians apply to Dr. Alexander and his practice.

53.     Because Dr. Alexander uses residents only to perform pre-op and post-op services on his patients physician assistants, rather than residents, are the personnel left to their own devices in the operating room during key and critical portions of the surgery, without a qualified surgeon available to assist. Dr. Alexander consistently does not use residents in the operating room.

54.     Because Dr. Alexander's practice involved and continues to involve residents he is subject to restrictions governing teaching physicians that render many, if not all, of Dr. Alexander's surgeries ineligible for payment by Medicare and other government insurance programs.

55.     Relators' investigation revealed that Dr. Alexander, a teaching physician, routinely books multiple concurrent surgeries throughout the day. Indeed, Dr. Alexander at times books as many as three surgeries concurrently, including two or more complicated or high-risk procedures.

56.     The surgical procedures did not merely overlap on their margins, but were scheduled at or about the same time, making it impossible for Dr. Alexander to assure that he could be physically present and ready to participate in the key or critical parts of each surgical procedure. Dr. Alexander commonly makes himself available for only a small portion of each procedure, leaving the rest in the hands of physicians' assistants.

57.     While Medicare requires another qualified teaching physician to be on stand-by to assist residents and fellows in surgeries where the teaching physician had moved on to another surgery, no resident or fellow was ever present in an operating room while concurrent surgeries were performed. Dr. Alexander exclusively used physician assistants in the operating room, none of whom possessed the experience to perform the extent of the procedures routinely required of them.

58.     Dr. Alexander's procedures routinely involve very high-risk complex procedures, which often have multiple critical portions. Dr. Alexander is routinely not present for many such key and critical portions, including procedures involving vertebral bone removal.   Indeed, nearly every one of his overlapping surgery claims is supported by an operative report that attests to Dr. Alexander's presence not only for the key and critical parts of each surgery, but for the entire

surgery. These reports, of course, are false on their face given the logistical impossibility of attending overlapping surgeries for their entire durations simultaneously.

59.     Though their interactions with their patients and review of patient information within their custody and/or available in the ordinary course of their duties at CHRISTUS Shoreline, Relators secured numerous representative examples of Defendants' fraudulent scheme and resulting false claims.

60.     The following representative examples drawn from Relator's anesthesia billing data make clear that Dr. Alexander often performs multiple major surgeries simultaneously. The data reflects the times during which the patients were in the operating room and under anesthesia, and accordingly, the duration of the anesthetic period Relator billed to Medicare. The data sets forth numerous examples of Dr. Alexander covering multiple concurrent surgeries on specific days in 2013, 2014 and 2015.

| Name | Date | Start Time | End Time | Payer | Hospital | Name of Surgeon |
|------|------|-----------|----------|-------|----------|-----------------|
| Patient 1 | 8/9/2013 | 8/9/2013 7:37 | 8/9/2013 8:52 | Medicare | Christus Spohn Shoreline | Alexander, Mathew T |
| Patient 2 | 8/9/2013 | 8/9/2013 8:01 | 8/9/2013 9:18 | Medicare | Christus Spohn Shoreline | Alexander, Mathew T |
| Patient 3 | 8/9/2013 | 8/9/2013 9:05 | 8/9/2013 10:04 | Medicare HMO | Christus Spohn Shoreline | Alexander, Mathew T |
| Patient 4 | 8/9/2013 | 8/9/2013 9:37 | 8/9/2013 11:16 | Medicare | Christus Spohn Shoreline | Alexander, Mathew T |
| Patient 5 | 8/9/2013 | 8/9/2013 10:32 | 8/9/2013 11:56 | Tricare/Champus | Christus Spohn Shoreline | Alexander, Mathew T |
| Patient 6 | 8/9/2013 | 8/9/2013 11:28 | 8/9/2013 12:52 | Medicare | Christus Spohn South | Alexander, Mathew T |
| Patient 7 | 8/9/2013 | 8/9/2013 12:25 | 8/9/2013 13:51 | Medicare | Christus Spohn Shoreline | Alexander, Mathew T |
| Patient 8 | 8/9/2013 | 8/9/2013 13:25 | 8/9/2013 14:57 | Aetna | Christus Spohn Shoreline | Alexander, Mathew T |
| Patient 9 | 8/9/2013 | 8/9/2013 14:18 | 8/9/2013 15:47 | Spohn Health Net | Christus Spohn Shoreline | Alexander, Mathew T |
| Patient 10 | 8/9/2013 | 8/9/2013 15:44 | 8/9/2013 16:59 | Medicare | Christus Spohn Shoreline | Alexander, Mathew T |
| Patient 11 | 8/9/2013 | 8/9/2013 16:38 | 8/9/2013 18:17 | Cigna | Christus Spohn Shoreline | Alexander, Mathew T |
| Patient 12 | 8/9/2013 | 8/9/2013 17:32 | 8/9/2013 19:45 | Medicare HMO | Christus Spohn Shoreline | Alexander, Mathew T |
| Patient 13 | 8/9/2013 | 8/9/2013 19:19 | 8/9/2013 22:32 | Medicare | Christus Spohn Shoreline | Alexander, Mathew T |
| Patient 14 | 8/9/2013 | 8/9/2013 21:23 | 8/10/2013 0:50 | Blue Cross | Christus Spohn Shoreline | Alexander, Mathew T |
| Patient 15 | 2/21/2014 | 2/21/2014 8:00 | 2/21/2014 8:53 | MEDICARE | Christus Spohn Shoreline | Alexander, Mathew T |
| Patient 16 | 2/21/2014 | 2/21/2014 8:50 | 2/21/2014 9:45 | MEDICARE HMO | Christus Spohn Shoreline | Alexander, Mathew T |
| Patient 17 | 2/21/2014 | 2/21/2014 9:08 | 2/21/2014 10:14 | TRICARE/CHAMPU | Christus Spohn Shoreline | Alexander, Mathew T |
| Patient 18 | 2/21/2014 | 2/21/2014 10:04 | 2/21/2014 11:20 | MEDICAID HMO | Christus Spohn Shoreline | Alexander, Mathew T |
| Patient 19 | 2/21/2014 | 2/21/2014 10:53 | 2/21/2014 12:33 | MEDICARE | Christus Spohn Shoreline | Alexander, Mathew T |
| Patient 20 | 6/27/2014 | 6/27/2014 7:26 | 6/27/2014 8:19 | Medicare HMO | Christus Spohn Shoreline | Alexander, Mathew T |
| Patient 21 | 6/27/2014 | 6/27/2014 7:36 | 6/27/2014 9:16 | Medicare | Christus Spohn Shoreline | Alexander, Mathew T |
| Patient 22 | 6/27/2014 | 6/27/2014 8:50 | 6/27/2014 10:44 | Medicare | Christus Spohn Shoreline | Alexander, Mathew T |
| Patient 23 | 6/27/2014 | 6/27/2014 10:02 | 6/27/2014 10:56 | Medicare HMO | Christus Spohn Shoreline | Alexander, Mathew T |
| Patient 24 | 6/27/2014 | 6/27/2014 11:02 | 6/27/2014 12:27 | Medicare HMO | Christus Spohn Shoreline | Alexander, Mathew T |
| Patient 25 | 6/27/2014 | 6/27/2014 11:49 | 6/27/2014 13:40 | Commerical/N | Christus Spohn Shoreline | Alexander, Mathew T |
| Patient 26 | 6/27/2014 | 6/27/2014 13:09 | 6/27/2014 15:24 | Medicare | Christus Spohn Shoreline | Alexander, Mathew T |
| Patient 27 | 6/27/2014 | 6/27/2014 14:24 | 6/27/2014 16:11 | Blue Cross | Christus Spohn Shoreline | Alexander, Mathew T |
| Patient 28 | 6/27/2014 | 6/27/2014 15:56 | 6/27/2014 17:38 | Medicare | Christus Spohn Shoreline | Alexander, Mathew T |
| Patient 29 | 6/27/2014 | 6/27/2014 16:58 | 6/27/2014 19:22 | Medicare | Christus Spohn Shoreline | Alexander, Mathew T |
| Patient 30 | 6/27/2014 | 6/27/2014 19:40 | 6/27/2014 20:32 | Medicare | Christus Spohn Shoreline | Alexander, Mathew T |
| Patient 31 | 6/27/2014 | 6/27/2014 20:58 | 6/27/2014 23:04 | Medicare | Christus Spohn Shoreline | Alexander, Mathew T |
| Patient 32 | 2/6/2015 | 2/6/2015 9:47 | 2/6/2015 12:23 | MEDICARE HMO | Christus Spohn Shoreline | Alexander, Mathew T |
| Patient 33 | 2/6/2015 | 2/6/2015 11:39 | 2/6/2015 13:11 | MEDICARE HMO | Christus Spohn Shoreline | Alexander, Mathew T |
| Patient 34 | 2/6/2015 | 2/6/2015 12:44 | 2/6/2015 14:38 | BLUE CROSS | Christus Spohn Shoreline | Alexander, Mathew T |
| Patient 35 | 2/6/2015 | 2/6/2015 14:00 | 2/6/2015 17:10 | VETERANS ADMINI | Christus Spohn Shoreline | Alexander, Mathew T |
| Patient 36 | 5/1/2015 | 5/1/2015 7:40 | 5/1/2015 8:34 | Medicare | Christus Spohn Shoreline | Alexander, Mathew T |
| Patient 37 | 5/1/2015 | 5/1/2015 8:13 | 5/1/2015 9:34 | Medicare | Christus Spohn Shoreline | Alexander, Mathew T |
| Patient 38 | 5/1/2015 | 5/1/2015 8:56 | 5/1/2015 9:59 | Medicare HMO | Christus Spohn Shoreline | Alexander, Mathew T |
| Patient 39 | 5/1/2015 | 5/1/2015 9:50 | 5/1/2015 10:55 | Medicare | Christus Spohn Shoreline | Alexander, Mathew T |
| Patient 40 | 5/1/2015 | 5/1/2015 10:28 | 5/1/2015 11:22 | Medicare | Christus Spohn South | Alexander, Mathew T |
| Patient 41 | 5/1/2015 | 5/1/2015 11:02 | 5/1/2015 12:15 | Medicare | Christus Spohn Shoreline | Alexander, Mathew T |
| Patient 42 | 5/1/2015 | 5/1/2015 11:54 | 5/1/2015 13:02 | Medicare HMO | Christus Spohn Shoreline | Alexander, Mathew T |
| Patient 43 | 5/1/2015 | 5/1/2015 12:39 | 5/1/2015 14:18 | Blue Cross | Christus Spohn Shoreline | Alexander, Mathew T |
| Patient 44 | 5/1/2015 | 5/1/2015 13:30 | 5/1/2015 14:44 | Medicare HMO | Christus Spohn Shoreline | Alexander, Mathew T |
| Patient 45 | 5/1/2015 | 5/1/2015 14:47 | 5/1/2015 16:05 | Medicare | Christus Spohn Shoreline | Alexander, Mathew T |
| Patient 46 | 5/1/2015 | 5/1/2015 15:24 | 5/1/2015 17:41 | Blue Cross | Christus Spohn Shoreline | Alexander, Mathew T |
| Patient 47 | 5/1/2015 | 5/1/2015 16:34 | 5/1/2015 19:20 | Commerical/N | Christus Spohn Shoreline | Alexander, Mathew T |
| Patient 48 | 5/1/2015 | 5/1/2015 18:41 | 5/1/2015 21:09 | Medicare HMO | Christus Spohn Shoreline | Alexander, Mathew T |

61.    The examples above show that concurrent surgeries were not staggered to reduce overlap to a mere de minimis degree. In some cases, surgeries began and ended at approximately the same time; while some were of such long duration that it was impossible for Dr. Alexander to be present for significant time periods.

19

62.     Relators are not aware of any concurrent surgery performed by Dr. Alexander for which another qualified teaching physician was available, designated or utilized to assist a resident or physician assistant during concurrent surgeries.

63.     Among the corporate representatives of Defendants who are knowledgeable of the conduct alleged herein are President and Chief Executive Officer Kelly Elkins, former Chief Operating Officer Francis A. Pommett, Jr., Chief Nursing Officer Julia Pina, and Operating Room Director Shanna Williams.

64.     Relators have direct and personal knowledge that Defendants' corporate management has long been aware that Dr. Alexander is rarely, if ever, present during all parts of the surgery, and that he is routinely not present during the critical parts of surgeries.

65.     Relators have direct and personal knowledge that Defendants are aware that Dr. Alexander is never present for the entire duration of his surgeries, even though his representations made in clinical records are to the contrary.

66.     Defendants have systematically submitted and received reimbursement for Dr. Alexander's enormous volume of spinal surgeries despite his  routine failure to comply with Medicare regulations governing overlapping surgeries.

67.     Dr. Alexander's illegal practices regarding concurrent surgery have remained consistent throughout Relators' long tenures with Defendants.  Those practices continue to the present day.

68.     Had CMS known that Dr. Alexander's surgical procedures were ineligible for reimbursement, it would not have reimbursed Defendants for such procedures, because it was under a statutorily imposed obligation not to do so.

**B.      Unnecessary Anesthesia/Operating Room Time**

69.      Due to his high volume surgical practice, Dr. Alexander's standard of care is to move directly from one concurrent surgery to the next without factoring in any time for anesthesia to be prepared at the beginning of any individual surgery.  Due to this practice, patients must wait under general anesthesia for unnecessarily prolonged periods of time until Dr. Alexander arrives at the operating room.  Dr. Alexander's sole purpose in following this standard of care is to avoid the inconvenient, rate-limiting factor of having to wait for patients while they are being anesthetized before initiating a new surgery.

70.      This practice results in inordinate delay, with patients routinely waiting in the operating room under general anesthesia for an average of 20-30 minutes before Dr. Alexander initiates surgery.  Patients are required to wait even longer periods of time when physician assistants reach impasses during surgery that require Dr. Alexander's advice and intervention. Anesthesia services provided during these periods of delay are not reasonable and medically necessary.

71.      Anesthesia services are billed to Medicare and other government healthcare programs  based on the length of time patients spends under its influence, in fifteen-minute increments.[8]  For each period of delay caused by Dr. Alexander's concurrent surgery practices, Defendants' actions caused the Government to be overbilled for anesthesia beyond what was reasonable and medically necessary.

---

[8] *See* https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/2017Downloads/R37 47CP.pdf, last viewed Dec. 3, 2018, 7:50 PM ("Actual anesthesia time in minutes is reported on the claim. For anesthesia services furnished, the A/B MAC computes time units by dividing reported anesthesia time by 15 minutes.")

72.     Because anesthesia must be administered in the operating room, Defendants further bill Medicare for the unnecessary operating room time Christus' personnel spend waiting for Dr. Alexander to arrive in the operating room from another concurrently scheduled surgery.

73.     Not only is excessive anesthesia medically unnecessary, but it is medically harmful to patients.  Because general anesthesia carries inherent health risks to the patient, the appropriate medical standard of care is to keep anesthesia to a minimum.

74.     Dr. Alexander's physician assistants completed both critical and non-critical parts of his surgeries and waited for Dr. Alexander to perform additional critical parts while the patient remained under anesthesia.  Dr. Alexander was not present during these excessively long periods of anesthesia.,.  Indeed, Dr. Alexander's patients were often placed under anesthesia with neither Dr. Alexander nor his physician assistant in the operating room

75.     Dr. Alexander acted with the full consent and support of Defendants' corporate management when he structured his practice in a way that would require that his patients being anesthetized before his arrival in the operating room, resulting in  unnecessary operating room time and unnecessary anesthesia.

76.     Defendants' practice of billing for unreasonable and unnecessary anesthesia was particularly commonplace in Dr. Alexander's practice, because it came as a direct outgrowth of his concurrent surgery practice.

77.     Virtually every claim submitted for concurrent surgeries performed by Dr. Alexander contains inflated charges for anesthesia services and is a false claim, including claims for anesthesia services associated with the claims set forth in Paragraph 60, above.

## VI.    COUNTS

### A.    COUNT I

#### Federal False Claims Act, 31 U.S.C. § 3729(a)(1)

78.    All of the preceding allegations are incorporated herein.

79.    This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

80.    By virtue of the conduct described above, Defendants knowingly caused to be presented to Medicare, Medicaid, and other Government funded health insurance programs false or fraudulent claims for the improper payment or approval of claims for: concurrent and/or overlapping surgeries, which did not comply with Medicare rules; concurrent or overlapping surgeries, which were not properly documented; concurrent and/or overlapping surgeries where unreasonable and unnecessary anesthesia was provided to patients; and concurrent and/or overlapping surgeries where valid informed consent was not obtained.

81.    The United States, unaware of the falsity or fraudulent nature of the claims that Defendants caused, paid for claims that otherwise would not have been allowed.

82.    By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.

### B.    COUNT II

#### Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(B)

83.    All of the preceding allegations are incorporated herein.

84.    This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

85.    By virtue of the conduct described above, Defendants knowingly caused to be made or used false records or statements that caused false claims to be paid or approved by the United States government.

86.    The United States, unaware of the falsity or fraudulent nature of the claims that Defendants caused, paid for claims that otherwise would not have been allowed.

87.    By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.

C.    **COUNT III**

**Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(C)**

88.    All of the preceding allegations are incorporated herein.

89.    This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(C).

90.    Defendants entered into a conspiracy or conspiracies through their member physicians, officers, and employees to defraud the United States by submitting and obtaining approval and payment for false and fraudulent claims for health care services provided to beneficiaries of federal health insurance programs, for among other things, concurrent and/or overlapping surgeries, which did not comply with Medicare rules; concurrent or overlapping surgeries, which were not properly documented; concurrent and/or overlapping surgeries where unreasonable and unnecessary anesthesia was provided to patients; and concurrent and/or overlapping surgeries where valid informed consent was not obtained.

91.    The United States, unaware of the falsity or fraudulent nature of the claims that Defendants caused, paid for claims that otherwise would not have been allowed.

24

92.     By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.

**D.     COUNT IV**

### Violations of the Texas Medicaid Fraud Prevention Law
### (Tex. Hum. Res. Code § 36.002(4)(B))

93.     Plaintiff/relator repeats and realleges each and every allegation contained herein.

94.     This is a claim for restitution, interest, penalties and double damages under the Medicaid Fraud Prevention Law.

95.     By virtue of the acts described above, the Defendants, for the purpose of defrauding the Texas State Government, knowingly or intentionally made, caused to be made, induced, and/or sought to induce, the making of false statements or misrepresentations of material fact concerning information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program, within the meaning of Tex. Hum. Res. Code 36.002(4)(B).

96.     As a result, Texas State monies were lost through payments made in respect of the false statements or representations and other costs were sustained by the Texas State Government.

97.     Therefore, the Texas State Government has been damaged in an amount to be proven at trial. Additionally, the Texas State Government is entitled to the maximum penalty of $10,000 for each and every unlawful act committed by the Defendant under this provision. Tex. Hum. Res. Code § 36.052(3)(B).

**VII.   PRAYER FOR RELIEF**

WHEREFORE, for each of these claims, the *qui tam* Relator requests the following relief from each of the Defendants, jointly and severally, as to the federal and state claims:

A.   Three times the amount of damages that the federal and state governments sustain because of the acts of Defendants;

B.   A civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. §3729;

C.   The Relator be awarded the maximum "relator's share" allowed pursuant to 31 U.S.C. § 3730(d) for collecting the civil penalties and damages;

D.   The Relator be awarded reasonable attorneys' fees and costs pursuant 31 U.S.C.§ 3730(d);

E.   Interest; and

F.   Such further relief as the Court deems just and proper.

## VIII.   JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

Dated: December 18, 2018

Respectfully submitted,

/s/ Ross B. Brooks
Ross B. Brooks
**SANFORD HEISLER SHARP, LLP**
1350 Avenue of the Americas, 31st Floor
New York, NY  10019
Telephone: (646) 402-5650
Facsimile: (646) 402-5651
rbrooks@sanfordheisler.com

*Attorney-in-charge*

/s/ Joanne Cicala
Joanne Cicala
TX State Bar No. 24052632
SDTX Federal ID No. 1830261
**THE CICALA LAW FIRM PLLC**
101 College Street
Dripping Springs, TX  78620
Telephone: (512) 275-6550
Facsimile: (512) 858-1801
joanne@cicalapllc.com

*Attorneys for Relator*

JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

United States ex rel. Michael Mintz and David Williamson

**DEFENDANTS**

CHRISTUS HEALTH, CHRISTUS SPOHN HEALTH SYSTEM CORP., CHRISTUS SPOHN HOSPITAL – MEMORIAL, and CHRISTUS SPOHN HOSPITAL – SHORELINE.

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Dallas County, TX
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

See Attachment

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☒ 1 U.S. Government Plaintiff

☐ 3 Federal Question *(U.S. Government Not a Party)*

☐ 2 U.S. Government Defendant

☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☒ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from Another District *(specify)*

☐ 6 Multidistrict Litigation - Transfer

☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
False Claims Act, 31 U.S.C § § 3729-30

Brief description of cause:
Action for treble damages and civil penalties arising from false or fraudulent claims by Defendants

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:

JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____

DOCKET NUMBER _____

DATE
12/18/2018

SIGNATURE OF ATTORNEY OF RECORD
/s/ Joanne Cicala

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

## ATTACHMENT TO CIVIL COVER SHEET

**I.(a)(c) Attorneys (*Firm Name, Address, and Telephone Number*)**

Ross B. Brooks
SANFORD HEISLER SHARP, LLP
1350 Avenue of the Americas, 31st Floor
New York, NY  10019
Telephone: (646) 402-5650

Joanne Cicala
THE CICALA LAW FIRM PLLC
101 College Street
Dripping Springs, TX  78620
Telephone: (512) 275-6550